787 So.2d 331 (2001)
STATE of Louisiana in the Interest of B.M.
No. 2000-CA-1808.
Court of Appeal of Louisiana, Fourth Circuit.
January 24, 2001.
*332 Linda G. Johnson, Department of Social Services, Office of Community Services, New Orleans, LA, Attorney for Appellant.
Jeffrey G. Douglas, Law Offices of Jeffrey G. Douglas, New Orleans, LA, Attorney for Appellee.
Court composed of Judge PLOTKIN, Judge WALTZER, Judge McKAY.
McKAY, Judge.
The Department of Social Services/Office of Community Services (DSS/OCS) appeals the trial court's order that they pay B.K.M.'s adoptive mother, Zanoma Barrow, a stipend or adoption subsidy in the amount of $1,200 plus 100% of the foster care rate.
B.K.M., a severely disabled child diagnosed with cerebral palsy, intractable quadreparesis with microcephaly, seizure disorder and fetal alcohol syndrome, was born on January 17, 1994. He was placed in foster care on September 27, 1994, and adjudicated a "Child in Need of Care" on March 14, 1995. His biological parents signed Voluntary Acts of Surrender for Adoption. He was freed for adoption in 1996. From January 11, 1996 to July 13, 2000, the court continued at each review hearing to approve the case plan goal of adoption as the permanent plan for this child.
On May 4, 2000, the trial court rendered judgment "that the agency has not made reasonable efforts in this matter to place the child in an adoptive placement, based on the fact that the mother would not be entitled to funds if she adopted as the policy of the agency is that certain funding ceases when a child is adopted and this child has many special needs, and each case is to be worked on a case by case basis."
On May 11, 2000, a Motion for Rehearing was filed by DSS/OCS. On June 20, 2000, a special hearing was held specifically to address the issue of all services being offered to facilitate the adoption of B.K.M. The court's judgment dated July 13, 2000, found "... that it is in B.K.M.'s best interest to be adopted by his foster mother. The Court further finds that [sic] is in B.K.M.'s best interest for the foster mother to continue to receive the $1,200 stipend and that she receive 100% of the foster care rate."
B.K.M. came into foster care on September 27, 1994. He was placed in Zanoma Barrow's[1] approved specialized Alternative Family Care (AFC) home.[2] In an AFC home, the foster parent bears the primary direct service and case management responsibility for special need children placed in the home. When B.K.M. came to her home, Medicaid was providing for his medical needs. Additionally, as a foster parent, Ms. Barrow was given a $1,200 cash stipend as a supplement to the family for the care of B.K.M. and any other special children in the AFC home.[3]
*333 After the parents voluntarily surrendered B.K.M. to the state he became eligible for a subsidized adoption pursuant to La. R.S. 46:1790. Ms. Barrow, after vacillating on the prospect of adopting B.K.M., finally accepted the DSS/OCS adoption plan including the OCS adoption subsidy amount. Whether or not she initiated the request for additional subsidy is questionable. The trial court approved the state's case plan goal of adoption for B.K.M. This action is at the heart of the issue before this Court.
The state advances arguments on two assignments of error. First, the trial court lacked authority to set the amount of adoption subsidy to be paid to a prospective adoptive mother where the statute provides that DSS/OCS determine adoption subsidy amounts. Second, the trial court erred in its determination that the prospective adoptive mother should receive as an adoption stipend, the $1,200 Alternative Family Care (AFC) money currently being paid and 100% of the foster care special board rate. The state alleges that the award was excessive and contrary to DSS/OCS policy, promulgated pursuant to state law.
In 1980, Congress enacted an adoption subsidy program as part of the Adoption Assistance and Child Welfare Act to encourage the adoption of children with special needs. 42 U.S.C. § 620 et seq., and 42 U.S.C. § 670 et seq. The Act requires each state to maintain an adoption assistance program, which meets the federal requirements. In return, the federal government pays a percentage of adoption assistance payments for eligible children. The legislation establishing the subsidized adoption program is found in La. R.S. 46:1790 et seq., and virtually tracks the federal statutory provisions. Under La. R.S. 46:1790 et seq., the legislature authorizes the Department of Health and Human Resources, now the Department of Health and Hospitals (DHH), and the Department of Social Services (DSS) through the OCS to promulgate the rules necessary to implement the subsidized adoption program. Ultimately these rules are implemented to determine the amount of adoption subsidy that an applicant would be allowed.
In the instant matter B.K.M. had been under the state's custody and care since September 21, 1994 and had been in Ms. Barrow's Alternative Family Care home since October 10, 1994. He became eligible for adoption when his parents voluntarily surrendered him to the State of Louisiana.[4] Louisiana Children's Code Articles 1144 through 1146 and 687 through 710, provide for the permanency planning for a child who has been surrendered by its parents to the state through the OCS. Clearly the Adoption Assistance and Child Welfare Act applies to B.K.M.'s adoption thereby placing him under the auspices of the OCS. Furthermore, it was always the OCS's case goal plan for B.K.M. to be adopted throughout the various disposition review hearings and the trial court continued to approve this case goal plan.
The Louisiana statutes which allow DSS/OCS to create an adoption subsidy program for special need children to comport with the federal acts are La. R.S. 46:1790-1794. La. R.S. 46:1793 authorizes the DSS to adopt, promulgate, and enforce such rules and regulations as are necessary and appropriate to implement the new subsidy law. This court held in State in the Interest of Martorana, 619 So.2d *334 1121, 1123 (La.App. 4 Cir.1993), that so long as the amount of the subsidy set by the DSS is within the statutory restrictions of La. R.S. 46:1790 et seq., the trial court may not disturb the DSS allocation. The specifics of the subsidy contract, thereof, are not subject to review by the court absent a showing of deviation from the standard set forth in the enabling legislation. La. R.S. 46:1792 states that the department, not a court, determines eligibility for a subsidy and the amount of the subsidy. Ms. Barrow agreed to accept the amount offered by the DSS/OCS under the statute, together with separate services and financial assistance from the Office for Citizens with Developmental Disabilities (OCDD) and Medicare. The OCS offered 80% of the maximum foster care[5] and 100% of the maximum special board rate of $258.00. Furthermore, B.K.M.'s special need status had previously made him eligible for a specialized "AFC" foster home. Ms. Barrow had signed a contract with OCS to be the AFC foster care parent of B.K.M. Therefore, after his parents surrendered him to the state, his special need status made him eligible for a subsidized adoption pursuant to La. R.S. 46:1790 et seq. After B.K.M.'s adoption is completed he will no longer be eligible for foster care services but will enter the arena of adoption subsidized care or supported adoption.
There are three major components to B.K.M.'s subsidized adoption. The first is OCDD's Waiver Services, which have been implemented to benefit B.K.M. although there has not been any finalization of his adoption. This made the waiver services available to B.K.M. for his lifetime as long as he is medically and financially eligible. Under this program a personal care attendant would be assigned to B.K.M. for 35 hours a week during the school year, plus Ms. Barrow will receive 18 hours of respite care per week during the school year and additional hours for after school, i.e. summertime. Furthermore, if the adopted parent needed respite for personal reasons, further personal care would be arranged. The waiver services plan was put into effect so that after adoption the child's needs would be met and the adoptive parent would be relieved of obligations currently being provided through the AFC foster home. The intent behind this policy is clearly to make the special child more appealing or adoptable to prospective parents, realizing that the goal is to place the special child in a home with permanency. This status would not change after the finalization of the adoption. By contrast, the extended foster care status would only guarantee $1,200 stipends until he had attained the age of 18, and Medicaid benefits paid for all of his medical expenses and needs in addition to OCDD's waiver services. These services are also for the extent of his lifetime. Third, the OCS adoption subsidy would be implemented under the regulations of R.S. 46:1790 et seq., which would allow Ms. Barrow 80% of the maximum foster care and 100% of the special board payment.
The Juvenile Court is given original jurisdiction in cases involving support of family in three instances enumerated in La. Ch. C. Art. 311. Support jurisdiction in juvenile court is narrowly limited to 1) proceedings by one parent or spouse against the other: 2) proceedings under Revised Uniform Reciprocal Enforcement of Support Act (URESA) or under the short title the Uniform Interstate Family Support Act (UIFSA) La. Ch.C. Art. 1301.1 et seq.; or 3) proceedings brought *335 by the Department or District Attorney against a parent. (See La. Ch.C. art. 311)
Additionally, La. R.S. 46:1792 and 1793 authorize the DSS to promulgate and enforce rules regarding adoption subsidies, and to determine the prospective adoptive parent's eligibility for adoption subsidies.
The granting and setting of an adoption subsidy and any appeals that follow are administrative procedures, which the court cannot supercede. Ms. Barrow was made aware of the conditions of the adoption procedure and the adoption subsidy, which would follow. She was made aware that she would lose the $1200.00 stipends from the OCS but that services would be substituted in its place such as more hours of service from a personal care attendant for B.K.M. and more respite care inuring to her benefit. She was made aware of other supporting programs that B.K.M. would now be eligible for, including the fact that the subsidies and services would extend for the duration of B.K.M.'s life not just until he reaches the age of eighteen, as it would if he were to remain in extended foster care. Clearly, these new programs and services provided to B.K.M. and Ms. Barrow are advantageous to B.K.M. and in his best interest, which is preeminent in this whole process.
In State ex rel. A.R., 99-3228 (La.App. 4 Cir. 5/24/2000), 765 So.2d 395, this Court said, "The specifics of the subsidy contract, therefore, are not subject to review by the court absent a showing of deviation from the standard set forth in the enabling legislation." OCS offered the maximum allowed subsidy under the enabling legislation. There was no evidence of deviation from the statutory standard. Therefore, the juvenile court was without authority to review the specifics of the adoption subsidy contract or to increase the amount of the subsidy. It is clear from the various statutes concerning subsidized adoption that the legislature empowered the Department, not the courts, to determine the amounts of the adoption subsidy to be offered to Ms. Barrow.
As discussed above, Louisiana law authorizes the DSS to set the rules regarding adoption subsidies. La. R.S. 46:1793, State of Louisiana In the Interest of Martorana, supra. Both state and federal law limit the maximum rate of an adoption subsidy "not to exceed the foster care maintenance payments in a foster family home" 42 U.S.C.A 673(3) and provide that the subsidy "shall not exceeds 100% of the cost of providing foster care for the child" La. R.S. 46:1791. Based on the statutory ceiling for adoption subsidy, the trial court's award of a $1,200 foster care stipends plus 100% of the foster care rate, violates the law in that it exceed 100% of the foster care costs. Furthermore, the trial court was in error in its monetary award in that it did not take into account the change in legal status of the adoptive parent and the concomitant obligation that occurs at adoption. Once an adult adopts a child, the adult is considered the legal parent of that child and the state is not obligated to pay adults to support their children. The trial court failed to consider that a subsidy by its very definition is meant to be supplemental assistance, not full support. By the act of adoption, Ms. Barrow has voluntarily assumed full time care and control of B.K.M., including financial responsibility and difficulties that are part of parenthood. The change in Ms. Barrow's legal status towards B.K.M. requires that the amount of the adoption subsidy be reduced to exclude all costs for all regular parental obligations. As an adoptive parent, Ms. Barrow will no longer be subject to the rules and duties that the state imposes on AFC foster homes for which she was paid. She will assume full legal and moral responsibility for B.K.M.'s care with the *336 maximum subsidy allowed by statute and the state. B.K.M. will continue to receive benefits from the OCDD Waiver Services that include a personal care attendant and respite care providers for his lifetime. Albeit, Louisiana determines the amount of adoption subsidies by reference to foster care rates, the child is an adoptive child, not a foster child and Ms. Barrow is not a foster care parent but an adoptive parent. Louisiana is not obligated to provide full or identical "foster" care services or payments to an adopted child as the state has no authority to determine the care, custody, or control of the adopted child. (See State in the Interest of Martorana, supra).
The purpose of an adoption subsidy is to facilitate not fully finance, adoptive placement for special needs children with capable parents who cannot accept full financial responsibility for the child. La. R.S. 46:1790; OCS Policy Manual 8-700. However, when coupled with Medicaid, OCDD waiver services and other support, Ms. Barrow is being compensated for all of B.K.M.'s needs.
In State In the Interest of Martorana, supra, this Court recognized the competing factors in the allocation of limited resources available for special needs children.
These amounts are determined by balancing the desire to provide assistance for parents of "special needs" children with the realities of budgetary limitations. Although a particular child may have greater needs, the legislature through OCS, has not yet determined that a greater subsidy should be available for that child. An increase in the amounts available to children with particularly severe disabilities is better addressed in the legislature and not by the courts of this state.
At 1124.
Thus, Ms. Barrow will not have to pay for childcare or support services. She will not have to pay for medical need or insurance. Under OCS's plan, Ms. Barrow will receive a total amount of $807.90 in cash from the combination of adoption subsidy and OCDD funds.
The trial court lacked jurisdiction and authority to determine and award an excessive amount of adoption subsidy to Ms. Barrow and as such committed manifest error. For the foregoing reasons, we reverse the judgment of the juvenile court.
REVERSED
NOTES
[1] Ms. Barrow had other children with special needs in her home one of which she adopted and another who died.
[2] These homes provide care for Special Needs children until an actual plan of adoption is realized.
[3] This is a total amount and not based on the number of children in the home.
[4] His mother surrendered him on September 6, 1995 and the father surrendered him on January 10, 1995.
[5] The maximum rate for maintenance is currently $9.73 per day or approximately $291.90 per month and will increase when he reaches that age of thirteen to $10.63 or approximately $318.50 per month.